**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**     **:**

      **v.**                   **:**       **CRIMINAL NO. 3:19-32**

**JOHNNIE BAKER, and**           **:**        **(JUDGE MANNION)**
**ALEXANDER MARTINEZ,**

                              **:**

      **Defendants**

## MEMORANDUM

Presently before the court is Defendant Johnnie Baker's August 27, 2020 motion to suppress a warrantless ping of his cellphone, (i.e., real-time tracking of an individual via a cellphone), and the fruits of a subsequent search that were obtained as a result of the ping, (Doc. 94), in which Defendant Alexander Martinez joins, (Doc. 96). Defendants contend that using technology by the government and obtaining real-time cell tracking information, without a warrant, to locate them inside a private home violated their protected privacy interests. Defendants also maintain that law enforcement's ability to locate them inside a home, a highly protected area, using advanced technology, namely, real-time Cell Site Location Information (CSLI), on Baker's cell phone without a search warrant is inconsistent with society's expectations of privacy and violates the 4th Amendment.

Defendants filed their briefs in support of the motions, (Docs. 95 & 97), and submitted as Exhibits, including the Affidavit of Probable Cause in support of the search warrant; a Wilkes-Barre police report regarding Defendants' arrest and the search of a house located at 280 New Hancock Street, Luzerne County, Pennsylvania, and the records from Luzerne County 911 Communications Center, (Doc. 95-1). The government filed a brief in opposition to the motions, (Doc. 118), and both Defendants submitted reply briefs. (Docs. 119 & 120). In response to each of these reply briefs, the government submitted sur reply briefs. (Docs. 127 & 128).

Defendant Martinez filed a motion to amend/correct his motion to suppress to include an additional argument raised in his reply brief, and Defendant Baker joined this motion. (Docs. 130 & 132). On April 15, 2021, the court granted Defendants' motions to amend/correct their motions to suppress. (Docs. 136 & 137). *See* 2021 WL 1517843 (M.D. Pa. 2021).

In light of an April 26, 2021, Seventh Circuit decision addressing a 4th Amendment challenge to government collection of a defendant's real-time cell-site location information, United States v. Hammond, 996 F.3d 374, the court requested the parties submit supplemental briefs addressing the relevance of the Hammond decision to the instant case. (Doc. 136). Each party has submitted the requested supplemental briefs, (Docs. 139-141), and

the motions to suppress are now ripe for disposition. Defendants also have requested an evidentiary hearing with respect to their motions. Both Defendants contend that a *Franks* hearing is necessary in order to determine whether several alleged deficiencies in the affidavit in support of the search warrant for the house were material to the probable cause finding.

## I.   BACKGROUND

On January 22, 2019, both Defendants were indicted for possession with intent to distribute methamphetamine and cocaine base, (Count I), possession with intent to distribute heroin, (Count II), possession with intent to distribute methamphetamine, (Count III), possession with intent to distribute cocaine base ("crack"), (Count IV), possession of firearms in furtherance of a drug trafficking crime, (Count V), and possession of a firearm with altered serial number, (Count VII). In Count VI, Baker alone was charged with being a felon in possession of firearms. (Doc. 1).

The following information is based on the Wilkes-Barre Police Department's Affidavit of Probable Cause and supplementary narratives filed by officers Shawn Yelland and Matthew Smith, which have been submitted by Defendants as Exhibits 1, 2, and 5. (Doc. 95-1 at 2-6, 16-17). The charges against Defendants stemmed from an incident on December 17, 2017, when

the Wilkes-Barre Police received a 911 call from a female caller requesting help at 19 Bradford Street in Wilkes-Barre, Pennsylvania. (Doc. 95-1 at 2). When police arrived at the house, they encountered Danylle Rambo and discovered a blood trail leading to the kitchen, where they encountered Darryll Elliott. (Id.). Elliott was bleeding from the head, with blood running down his face from a laceration above his eye. (Id.). Police learned from Elliot that he and Rambo had come to the house to purchase heroin, but after they knocked on the door, Elliott was struck in the head by a black male and did not remember anything further. (Id.).

Police located Richard Kasperitis upstairs in the Bradford Street house and, while hesitant, he spoke with police. (Id.). Kasperitis stated that he lived at the house with his girlfriend and had been using heroin for three to four months. (Id.). He also stated that two months earlier, two drug dealers, a black male known as "Feddy" and a Spanish male, "Bug," kicked two other drug dealers out and began dealing heroin, crack cocaine and marijuana from the house. (Id.). Kasperitis stated that Feddy and Bug always carried handguns and told him they had "bodies on them" from Philadelphia. (Id.; Doc. 95-1 at 5). Kasperitis also stated that his role was to answer the door and make initial contact with drug buyers, then Feddy or Bug would complete the transactions. (Doc. 95-1 at 2).

On December 17, 2017, Kasperitis received phone calls from Rambo, who was seeking to buy heroin, and he told her to wait because Feddy and Bug were in the process of packaging the drugs. (Id.). At 5:00 a.m., Kasperitis said he heard a banging on the front door, followed by an argument and a female screaming. (Id.).

The police also interviewed Rambo, who stated that she called Kasperitis several times during the night because Elliott was "dope sick" and needed heroin, but Kasperitis told her to wait. (Doc. 95-1, at 3). Eventually, Rambo and Elliott decided to go to the Bradford Street house and knock on the door. (Id.). When a male voice inside the house asked who was at the door, Elliott became impatient and began kicking and pounding on the door. (Id.). Feddy and Bug then opened the door and pointed handguns at them, and Rambo began yelling and screaming since she thought they were about to be killed. (Id.). Once inside, Feddy and Bug began beating Elliott; Bug hit Elliott with a hammer and Feddy pistol whipped him. (Id.). Feddy briefly went upstairs then came back down and hit Elliott again. (Id.).

After the assault incident with Elliott, Kasperitis stated that Feddy went back upstairs in the Bradford Street house holding a .38 revolver and opened the cylinder, stating he was waiting for an Uber ride and would call later. (Id.). Feddy also said that Kasperitis would be the "star witness" regarding the

assault, and to "tell the truth." (Id.). Kasperitis elaborated that Feddy and Bug

utilized an Uber driver, Darik Johnson, who lived at 280 New Hancock Street,

to travel to Philadelphia to purchase their drugs. (Doc. 95-1, at 3). Johnson

picked up and transported Feddy and Bug from the Bradford Street house

shortly after the assault of Elliott. (Id.). Kasperitis said the two men took two

handguns, approximately 100 grams of cocaine, 10 bricks of heroin, and 4

pounds of marijuana with them. (Id.). Police also located Samantha Uhl

upstairs in the house, who confirmed Kasperitis' story and said that everyone

in the house was afraid of Feddy and Bug. (Doc. 95-1, at 6).

Elliott was then transported to the hospital and while it was first

believed that one of his wounds had been caused by a small caliber bullet, it

was later discovered that it was in fact caused by a hammer. (Id; Doc. 95, at

4 n. 2).

As explained in the affidavit of probable cause for a search warrant for

the 280 New Hancock Street house, subsequently obtained by police, the

following occurred:

> On December 17, 2017, after arriving on scene,
> Wilkes-Barre police requested that [the] 911 center
> perform a Ping on the cellular phone utilized by
> Feddy, due to the fact that a male was shot and that
> he was armed and dangerous.

- 6 -

That number was 2159109637. The result showed that the phone was located within 14 meters of 280 Hancock St.

Based on the information listed above, the fact that a man was shot and assaulted, the fact that the firearm(s), drugs, [and] hammer, were placed into a car driven by Johnson, who resides at 280 New Hancock St., shortly thereafter, and the phone utilized by the suspect in the shooting [Baker], showing a location of with in [sic] 14 meters of 280 New Hancock St. within half hour [sic] after the shooting, and constant surveillance being conducted this date in the area in which the phone is believed to be specifically 280 New Hancock St., showing no one leaving the address, affiants believe that the suspects and evidence involved in this Aggravated Assault are currently located at 280 New Hancock St., respectfully request a search warrant to search the premises and curtilage of 280 New Hancock St., Wilkes-Barre, Pa.

(Doc. 95-1, at 3).

Utilizing the location data obtained from the ping on Baker's cellphone, police obtained a search warrant for 280 New Hancock Street.[1] (Doc. 95-1

---

[1]Defendant Baker's Brief in Support of the Motion to Suppress avers that records obtained through subpoena from the Luzerne County 911 Communications Center indicate the following facts. (Doc. 95, at 4-5, n. 4). Shortly after the pings were requested, the carriers for the Defendants' telephone numbers were determined to be T-Mobile and Sprint. T-Mobile refused to ping the cell phone for apprehension purposes without a search warrant. Records obtained through subpoena from Sprint show that it conducted two pings on Baker's cellphone, which provided a location accurate within 14 meters, at 6:51 a.m. and 8:10 a.m. Baker also avers that it is unclear whether the second ping was conducted at law enforcement request.

at 6). On the first and second floors of the house, officers detained several individuals, namely, Tameghen Mays, Darik Johnson, Lauren Klinefelter, and an unidentified child. (Id.). Officers encountered Defendants Baker and Martinez exiting from the third floor of the house and apprehended them after a brief chase. (Id. at 6, 17). On the third floor, officers also located suspected narcotics in plain view, based upon which they obtained an additional search warrant for the premises. (Id. at 6). The police also located Baker's Sprint cellphone, that was the subject of the warrantless ping to find his location, on the third floor of 280 New Hancock Street house. (Id.).

Defendants now move to suppress all of the evidence seized at 280 New Hancock Street based on the warrantless ping on Baker's cellphone. (Doc. 94, ¶14). Defendants contend that, in order to conduct the ping on Baker's cellphone and determine their location, a warrant was required because the ping was a 4th Amendment search and they maintained a privacy interest in their current location.

---

Although Baker claims that the record does not indicate how officers obtained his cellphone number, the affidavit of probable cause in support of the search warrant application for the house located at 280 New Hancock Street reveals that after officers spoke to Kasperitis on December 17, 2017, at the 19 Bradford Street house, he provided them with two phone numbers for Feddy and Bug, including (215) 910-9637, which turned out to be Baker's cellphone number. (Doc. 121 at 3).

## II.    STANDARD

The court has jurisdiction over Defendants' motion to suppress under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Fed.R.Crim.P. 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015).

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Lange v. California, 141 S.Ct. 2011, 2017 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

> U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753-55

(2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause." Carpenter v. United States, 138 S.Ct. 2206, 2213 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists." United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996).

### A. Standing

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."

Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citing Rakas v. Illinois, 439 U.S. 128, 143-44, n.12 (1978). A reasonable expectation of privacy has "a source outside the Fourth Amendment, either by reference to the concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." U.S. v. Ellis, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "Under Katz, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." *Id.* (citations omitted).

### B. Exclusion of evidence

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" Lara-Mejia, 482 F.Supp.3d at 293

(M.D. Pa. 2020) (quoting United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561, (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" *Id.* "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *Id.* (citations omitted).

Exclusion does not necessarily follow every Fourth Amendment violation, rather, the exclusionary rule is applied in limited circumstances: "those 'unusual cases'" where it may "appreciably deter governmental violations of the Fourth Amendment." U.S. v. Katzin, 769 F.3d 163, 170 (3d Cir. 2014) (citing U.S. v. Leon, 568 U.S. 897, 909 (1984)). In deciding the rule's applicability, courts weigh "the deterrent value of suppression" against the social costs of exclusion. *Id.* at 171. Omission of reliable evidence can be one of these costs. *Id.*

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation omitted). Stated otherwise, where the search or

seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." U.S. v. Lowe, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011).

### C. Searches pursuant to a warrant

The Supreme Court regards exclusion of evidence obtained pursuant to a warrant as an "extreme sanction" that "should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," which center on deterring police misconduct. U.S. v. Leon, 468 U.S. 897, 916, 918 (1984).

The Fourth Amendment lays out four requirements of a valid search warrant. The warrant must: 1) be based on probable cause; 2) be supported by a sworn affidavit; 3) describe particularly the place of the search; and 4) describe particularly the persons or things to be seized. Groh v. Ramirez, 540 U.S. 551, 557 (2004).

"The Fourth Amendment requires that a search warrant be supported by probable cause, and '[e]vidence seized pursuant to a search warrant that

- 13 -

is not so supported may be suppressed.'" U.S. v. Rivera, 524 Fed.Appx. 821, 825 (3d Cir. 2013) (citation omitted).

### D. Searches not authorized by a warrant

"The touchstone of the Fourth Amendment is reasonableness." Holland v. Rosen, 895 F.3d 272, 301 (3d Cir. 2018) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). Searches not authorized by a warrant "are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." U.S. v. Harrison, 689 F.3d 301, 306 (3d Cir. 2012) (quoting California v. Acevedo, 500 U.S. 565, 580 (1991)).

### E. Good-faith exception

The exclusionary rule does not apply where it appears that law enforcement officers "acted with an objectively reasonable good-faith belief that their conduct was lawful, or when their conduct involved only simple, isolated negligence." Katzin, 769 F.3d at 171 (citing Davis v. U.S., 564 U.S. 229, 238 (2011)). By contrast, deterrence often outweighs the social costs and warrants exclusion "where law enforcement conduct is 'deliberate, reckless, or grossly negligent,' or involves 'recurring or systematic negligence.'" *Id.* (quoting Davis, 564 U.S. at 238, 240). The relevant question, then, in applying the good-faith exception is "whether a reasonably

well-trained officer would have known that the search was illegal in light of all of the circumstances." Katzin, 769 F.3d at 171. (quoting Herring v. U.S., 555 U.S. 135, 145 (2009)).

### F. Exigent circumstances exception

Another exception to the warrant requirement applies where "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Klein v. Madison, 374 F.Supp.3d 389, 411 (E.D. Pa. 2019) (quoting Kentucky v. King, 563 U.S. 452, 460 (2019)). The exigent circumstances exception is applied on a "case-by-case basis," Birchfield v. North Dakota, 136 S.Ct. 2160, 2180 (2016), which requires courts to consider the "totality of circumstances." Missouri v. McNeely, 569 U.S. 141, 149 (2013). Exigent circumstances include, among others, "danger to the lives of officers or others" or "the possibility that evidence may be removed or destroyed." U.S. v. Anderson, 644 Fed.Appx. 192, 194 (3d Cir. 2016) (citing U.S. v. Coles, 437 F.3d 361, 366 (3d Cir. 2006)). "The common thread is imminence—'the existence of a true emergency.'" U.S. v. Mallory, 765 F.3d 373, 384 (3d Cir. 2014) (quoting U.S. v. Simmons, 661 F.3d 151, 157 (2d Cir. 2011)). For example, "[e]xigent circumstances exist when officers are in hot pursuit of a fleeing suspect," Id. (citing Coles, 437 F.3d at 366),

"when they 'reasonably believe someone is in imminent danger,'" *Id.* (quoting Couden v. Duffy, 466 F.3d 483, 496 (3d Cir. 2006)), or "when they reasonably believe that they must act 'to prevent the imminent destruction of evidence.'" *Id.* (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). The burden is on the government to demonstrate that "exigent circumstances justified a search," *Id.* at 383, a burden which is "heavy." *Id.* (quoting Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)).[2]


## III.   DISCUSSION

Defendants' motions request the suppression of evidence seized at 280 New Hancock Street and aver that the search warrant for this address was unlawfully obtained based on the warrantless "ping" of Baker's cellphone requested by the government.[3]  (Doc. 94 ¶¶ 4, 6, 13). The court

---

[2]"Prior decisions of [the Supreme] Court, [], have emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated.'" Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) (quoting U.S. v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div., 407 U.S. 297, 318 (1972)).

[3]GPS-based location information can be generated "only at the specific command of" the network wireless carrier, "an action called 'pinging.'" United States v. Riley, 858 F.3d 1012 (6th Cir. 2017). "'Pinging' refers to a service provider's act of proactively identifying the real-time location of the cell phone when the cell phone would not ordinarily transmit its location on its own." *Id.* The determination of a cellphone location by "pinging," "consists of the cell phone carrier surreptitiously accessing by satellite the cell phone's GPS location, or if unavailable, its location in terms of its proximity to the nearest

first addresses the government's contention that Defendants lack standing to bring their motions.

## A. Standing

The government contends that Defendant Baker lacks standing because there is insufficient evidence regarding his ownership of the Sprint cellphone found at the Hancock Street house, since the records from Sprint do not indicate a name and address for the phone's owner. (Doc. 118, at 8-9). The government cites U.S. v. Serrano, 2014 WL2696569 (S.D. N.Y. 2014), which held that a defendant who did not put forward an affidavit concerning his privacy interest in a cell phone registered to his wife could not rely on the government's intention of linking him to the phone at trial as a basis for a privacy interest. *Id.* at *7. The court there explained that in order to show the privacy interest required for a motion to suppress under the Fourth Amendment, "a defendant generally must submit an 'affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search.'" *Id.* at *4 (quoting U.S. v. Ruggiero, 824 F.Supp. 379, 391 (S.D. N.Y. 1993).

---

cell phone tower." United States v. Caraballo, 963 F.Supp.2d 341, 346 (2d Cir. 2016).

Defendant Baker's reply brief includes as an Exhibit an application for a search warrant signed by Wilkes-Barre police officers Shawn Yelland and Peter Cordaro indicating that the Sprint cellphone at issue, a black Samsung with number (215) 910-9837, belongs to Johnnie ("Feddy") Baker. (Doc. 121, at 1). The affidavit of probable cause in support of the search warrant signed by the same officers also indicates that the Sprint cellphone belongs to Baker. (Id. at 3). These documents suffice to show that Defendant Baker has a privacy interest in the cellphone on which the ping was conducted and has standing to bring this motion to suppress.

Defendant Martinez, however, as the government concludes, has no expectation of privacy in Baker's Sprint cellphone. (Doc. 118, at 9). Martinez has offered no evidence to support a personal expectation of privacy in the cellphone or its location, and thus lacks standing to join Baker's motion to suppress. *See* State v. O'Donnell, 210 A.3d 815, 821 (Me. 2019) (holding that a defendant lacked standing to challenge the constitutionality of the government's acquisition of a third-party's cell-site location information). Similarly, in U.S. v. Ellis, 270 F.Supp.3d 1134, 1140 (N.D. Ca. 2017), the court held that "[i]n light of the record showing that two Stingrays [used to locate defendant Ellis's cellphone in real time and to monitor and track his phone since the Stingrays emitted signals], and no other defendant's cell

- 18 -

phone, Ellis alone has standing to bring the instant motion to suppress evidence obtained through use of Stingrays."[4] (citing Rakas, 439 U.S. at 133–34, 99 S.Ct. 421 ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.").

As such, Martinez's motion to suppress will be denied for lack of standing since the pings were used only to track Baker's cellphone. *See* Ellis, at 1140 (holding only Ellis has standing to challenge the use of a Stingray to locate his cell phone, and that no other defendant has standing to bring a motion to suppress", and "Ellis lacks standing to invoke the privacy rights of anyone else whose cell phone may have been located by the Stingrays."). Consequently, the court will proceed to discuss the motion to suppress with reference to only one Defendant, namely, Baker. *See id*. at 1139 ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or

---

[4]"Real-time CSLI is generated by devices known as cell-site simulators, sometimes known by the brand name of Stingray." "Cell-site simulators operate in real time and transmit signals as if they are cell towers, causing cellular devices near the simulator to identify the simulator as the most attractive cell tower in the area and thus to transmit – to the simulator – signals that identify the device in the same way the device's connection to a cell tower would generate CSLI that could be retrieved later by the provider." Matter of Search of Inform. Stored at Premises Controlled by Google, 481 F.Supp.3d 730, 739 (N.D. Ill. 2020) (internal quotations and citations omitted).

seizure." (citing Simmons v. United States, 390 U.S. 377, 389–390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

The threshold question, then, for the court's consideration is whether the ping of Defendant Baker's cellphone was a search under the Fourth Amendment and whether a search warrant was required prior to conducting the ping to determine Baker's real-time location.

## B. Whether the cellphone "ping" was a search

### a. Carpenter v. U.S. – Past Cell-Site Information

In Carpenter v. United States, 138 S.Ct. 2206, 2217 (2018), the Supreme Court addressed a Fourth Amendment challenge to government seizure of past cell-site location information ("CSLI").[5] The defendant there, Timothy Carpenter, was arrested on suspicion of robbery. *Id.* Government prosecutors applied for court orders to obtain Carpenter's cellphone records pursuant to the Stored Communications Act, which allows disclosure of cellphone records under certain circumstances. *Id.* Their request was

---

[5] "CSLI is generated by the radio signals emanated by a cell phone to the closest cell tower in the cellular service network," and "[t]he resulting CSLI includes the precise location of the cell tower and cell site serving the subject cell phone during each voice call, text message or data connection, and may be generated even without the user's interaction with the cell phone." Ellis, 270 F.Supp.3d at 1143 (internal quotations and citations omitted).

granted, and the government received thousands of location points, covering several months of movement, from Carpenter's wireless carriers. *Id.*

The Supreme Court granted *certiorari* to review Carpenter's motion to suppress the cell-site data. *Id.* Two lines of cases informed its analysis: first were those addressing "a person's expectation of privacy in his physical location and movements," and second were those drawing the "line between what a person keeps to himself and what he shares with others." *Id.* at 2215.

In U.S. v. Knotts, 460 U.S. 276, 281, 282 (1983), the Court held that the Government's use of a beeper to track a suspect's vehicle was not a search, because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."[6]

More recently, the Court in U.S. v. Jones, 565 U.S. 400, 403 (2012), considered the remote monitoring of a defendant's vehicle through a Government-installed GPS device. Although the case was not decided on Fourth Amendment grounds, five concurring Justices agreed that "longer term GPS monitoring in investigations of most offenses impinges on

---

[6]In Knotts, the Court noted that by travelling on public roads, the defendant had conveyed the details of such travel "to anyone who wanted to look," and that "visual surveillance . . . would have sufficed to reveal" the facts discovered by police through use of the beeper." 460 U.S. at 281-82.

expectations of privacy." *Id.* at 415 (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring in judgment).

In U.S. v. Miller, 425 U.S. 435, 443 (1976), the Court rejected a Fourth Amendment challenge to government collection of financial records from a defendant's bank. This collection was not a search, the Court concluded, because the defendant could "assert neither ownership nor possession" of the documents, and because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the assumption is revealed on the assumption that it will be used only for a limited purpose." *Id.* at 440, 443.

Finally, in Smith v. Maryland, 442 U.S. 735, 740, 742 (1979), the Court held that the government's collection of data using a pen register[7] was not a search. The Court explained that any expectation that the phone numbers one dials will remain private "is not one that society is prepared to recognize as reasonable," because phone users know "that they must convey numerical information to the phone company; that the phone company has

---

[7]"A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." Smith v. Maryland, 442 U.S. 735, 736 n. 1 (1979) (quoting U.S. v. N.Y. Tel. Co., 434 U.S. 159, 161 n. 1 (1977)).

facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." *Id.* at 743 (internal quotation marks omitted).

Returning to Carpenter—the Court there considered this precedent in applying the Fourth Amendment to "the ability to chronicle a person's past movements through the record of his cell phone signals." Carpenter, 138 S.Ct. at 2216. The majority declined to extend Miller and Smith to the circumstances before it, instead holding that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI," and consequently, the "government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment." *Id.* at 2217, 2220.

The Court recognized that an individual has some expectation of privacy in his physical location and movements, and expressed concern with allowing the government to access "an all-encompassing record of the [cell phone] holder's whereabouts." *Id.* at 2217. Such information, the Court reasoned, "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.*

The Court further emphasized "the retrospective quality of the data," which would allow the government to "travel back in time to retrace" the movements of virtually any person who carries a cell phone. *Id.* at 2218. This "tireless and absolute surveillance," in the Court's view, invaded Carpenter's reasonable expectation of privacy. *Id.* at 2218-2219.

Rejecting the government's argument that the third-party doctrine applied in Miller and Smith should decide the issue, the Court observed that "seismic shifts in technology" had made possible the "exhaustive chronicle of location information casually collected by wireless carriers today." *Id.* at 2219. The "revealing nature of CSLI," the Court reasoned, was sufficiently distinguishable from the "limited capabilities of a pen register" or the commercial nature of bank records. *Id.* Moreover, unlike the information shared with third-parties in Miller and Smith, "[c]ell phone location information is not truly 'shared' as one normally understands the term," because of the ubiquitous presence of cell phones in modern society and the automatic nature of location-sharing inherent to a cell phone's operation. *Id.* at 2220.

Finally, the Court clarified that its decision was "a narrow one." *Id.* Importantly, it specifically abstained from expressing a view on "real-time CSI," thus leaving this issue an open question. *Id.*

- 24 -

### b. <u>United States v. Hammond</u> – Real-time Cell-Site Information

Earlier this year, the Seventh Circuit addressed the question that <u>Carpenter</u> left open: whether governmental collection of real-time CSLI constitutes a search under the Fourth Amendment. <u>United States v. Hammond</u>, 996 F.3d 374, 387 (7th Cir. 2021). The defendant in <u>Hammond</u> was suspected of perpetrating a series of robberies. *Id.* at 380. After gathering information to identify Hammond as the lead suspect, state police requested CSLI from his cell service provider pursuant to 18 U.S.C. 2702(c)(4), which authorizes disclosure of customer records to governmental agencies in emergency circumstances. *Id.* at 381. A series of "pings" allowed officers to locate and pursue Hammond's vehicle, leading to his arrest and government seizure of contraband. *Id.* at 381-82.

The Seventh Circuit considered the relevant Supreme Court precedent, and concluded that the facts before it were more analogous to <u>Knotts</u> rather than <u>Carpenter</u>. *Id.* at 388-89. Unlike "the 127 days of monitoring at issue in *Carpenter*," the Court reasoned, the officers' "monitoring of Hammond's location lasted only a matter of hours." *Id.* at 389. Moreover, the officers in <u>Hammond</u> "only collected location data that Hammond had already exposed to public view while he travelled on public, interstate highways and into parking lots within the public's view." *Id.* Notably

also, the Court highlighted that "[l]aw enforcement used the real-time CSLI to find Hammond's location in public, not peer into the intricacies of his private life." *Id.* The Court further noted that the officers did not use the CSLI "to examine the defendant's movements *inside of a home* or other highly protected area." *Id.* (emphasis added).

The Seventh Circuit in <u>Hammond</u> went on to distinguish <u>Carpenter</u> because of the "retrospective quality" of the information collected there, a characteristic which particularly concerned the Supreme Court. *Id.* at 389-90. "Real-time CSLI collected over the course of several hours," the Seventh Circuit asserted, "simply does not involve the same level of intrusion as the collection of historical CSLI." *Id.* at 390. Finally, the Court explained that while the historical CSLI collected in <u>Carpenter</u> "contravened society's expectations not only of their own privacy, but also of law enforcement's capabilities"; the officers' "ability to locate Hammond on public roads for a six-hour period using real-time CSLI is not inconsistent with society's expectations of privacy from law enforcement's prying eyes." *Id.* Thus, the court concluded that "the collection of [Hammond's] real-time CSLI was not a search." *Id.* at 392.

### c. Lower Courts

Courts in other jurisdictions have contributed well-reasoned analyses of the issue at bar. Although the first two of these cases were decided before Carpenter and involve cell-site simulators[8], not CSLI from a cell service provider, the court finds them persuasive.

In State v. Andrews, 134 A.3d 324, 326, 350 (Md. Ct. Spec. App. 2016), the court held that the government's use of a cell-site simulator to pinpoint the defendant inside a private residence constituted a Fourth Amendment search. The court distinguished Knotts by noting that "the information obtained in this case was not readily available and in public view." *Id*. at 348. The court further opined that the "[u]nchecked" use of cell-site simulators "would allow the government to discover the private and personal habits of any [cell phone] user." *Id.* Rejecting the proposition that cell phone users voluntarily share their location simply by using the device, the court concluded that "people have a reasonable expectation of privacy in real-time cell phone location information." *Id.* at 349. Finally, the court stressed its concern with allowing the government "to obtain information about the contents of a home, not otherwise discernable without physical intrusion,"

---

[8]"A cell-site simulator . . . is a device that locates cell phones by mimicking the service provider's cell tower (or "cell site") and forcing cell phones to transmit "pings" to the simulator. The device then calculates the strength of the "pings" until the target phone is pinpointed." U.S. v. Lambis, 197 F.Supp.3d 606, 609 (S.D. N.Y. 2016).

noting the special Fourth Amendment protection of the home. *Id.* (citing Kyllo, 533 U.S. 27, 34-35, 40 (2001)). Acknowledging that the use of a cell-site simulator will not always intrude on the home, the court nonetheless expressed its holding broadly regarding the use of cell-site simulators, explaining that "[i]t would be impractical to fashion a rule prohibiting a warrantless search only retrospectively based on the fact that the search resulted in locating the cell phone inside a home or some other constitutionally protected area." *Id.*

The court in U.S. v. Lambis, 197 F.Supp.3d 606, 608-09 (S.D. N.Y. 2016), also considered the government's use of a cell-site simulator to locate the defendant in his apartment. Relying on Kyllo, and distinguishing Knotts, the court noted that the information obtained through the use of the simulator, which is not a device "in general public use," was not readily available "to anyone who wanted to look." *Id.* at 610 (quoting Kyllo, 533 U.S. at 40; Knotts, 460 U.S. at 281). The court also rejected the government's argument that because only the location of the target phone was determined, no intimate details of the home were revealed nor private matters implicated. *Id.* In rejecting this argument, the court cited U.S. v. Thomas, 747 F.2d 1359, 1366-67 (2d Cir. 1985), which held that police officers' use of a canine sniff outside a suspected drug trafficker's door constituted a search. Lambis, 197

F.Supp.3d at 610. The Second Circuit explained there that such a practice was intrusive because, although it would "disclose only the presence or absence of narcotics," it allowed police to detect "the contents of a private, enclosed space." <u>Thomas</u>, 757 F.2d at 1366-67. Relying on <u>Thomas</u>, the court in <u>Lambis</u> reasoned that "an electronic search for a cell phone inside an apartment is far more intrusive than a canine search because, unlike narcotics, cell phones are neither contraband nor illegal," and are "ubiquitous." 197 F.Supp.3d at 610.

Finally, in the wake of <u>Carpenter</u>, the Pennsylvania Superior Court has declared that government tracking of an individual through "pinging" his cell phone to obtain real-time CSLI constitutes a Fourth Amendment search. <u>Commonwealth v. Pacheco</u>, 227 A.3d 358, 370 (Pa. Super. Ct. 2020)[9]; *see also* <u>Commonwealth v. Wesley</u>, 2020 WL865277, at *9 (Pa. Super. Ct. 2020).

---

[9]In <u>Commonwealth v. Pacheco</u>, 227 A.3d 358, 370 (Pa. Super. Ct. 2020), the Superior Court explained:

We find no meaningful distinction between the privacy issues related to historical and real-time CSLI. In our view, the High Court's rationale in *Carpenter* extends to real-time CSLI tracking. Applying that Court's analogy, obtaining real-time CSLI is the equivalent of attaching an ankle monitor to the cell phone's user; it allows the government to track the user's every move as it is happening. *See* <u>Carpenter</u>, 138 S.Ct. at 2218. Therefore, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through real-time CSLI. As such, when prosecutors sought and obtained real-time information about Pacheco's location by pinging

### d. Analysis

Defendant Baker in his supplemental brief distinguishes Hammond based on where the suspect was located: that is, stating while "[t]he *Hammond* case involved the Government leveraging technology to locate and track a suspect on public roads, this case involves an invasion into the home." (Doc. 141, pg. 2). Defendant urges the court to apply U.S. v. Karo, 468 U.S. 705 (1984), and Kyllo v. U.S., 533 U.S. 27 (2001), in which the Supreme Court held that the government's use of a beeper and a thermal imager, respectively, to obtain information from within a defendant's home, constituted a search.

No doubt that if police obtain a search warrant, probable cause must support the warrant for real-time cellphone tracking. *See* U.S. v. Griggs, 2021 WL 3087985, *2 (E.D. Mich. July 22, 2021) (citing United States v. Powell, 943 F. Supp. 2d 759, 778 (E.D. Mich. 2013) ("[A] specific showing is required to establish probable cause when the government seeks a warrant for long-term real-time tracking of an individual via a cellphone."). In Powell, the court found that a "nexus" was required between the "evidence sought and the place to be searched." *Id*. at *3 (citing Powell, 943 F. Supp. 2d at 779 ("[T]he

_____

his cell phone, they conducted a 'search' under the federal and state constitutions."

government should have to demonstrate a nexus between a suspect and the phone, the phone and the criminal activity, as well as the criminal activity and the suspect's location in protected areas[.]")). As such, to obtain a search warrant seeking "long-term, real-time tracking of an individual via a cellphone" a nexus must exist between the cellphone and criminal activity. *Id*.

Here, the government contends that no search warrant was required to ping Baker's cellphone and that "[t]he facts of *Hammond* are in all relevant ways indistinguishable to the case at bar." (Doc. 139, at 4). Its brief focuses on the <u>Hammond</u> Court's reasoning regarding the limited nature of information collected: because real-time CSLI "is limited in time, scope, and context," the argument goes, it does not "violate the precepts of *Carpenter*" and consequently is not a search. (Id.). In addition, the government contends that the CSLI it obtained was less intrusive than the historical CSLI in <u>Carpenter</u>, because the information was "limited to [Defendants'] travel from the scene of the crime over public roads to the area of their residence" and, did not pertain to "their movements inside their residence." (Id., at 5).

While the real-time CSLI obtained here was indeed more limited in scope than the CSLI obtained in <u>Carpenter</u>, the court is unconvinced by the government's attempt to obscure the important distinction between tracking

an individual's movements on public roads and tracking him in a home. The government tries to characterize the information it obtained as relating only to the Defendants' travel on public roads, and thereby analogizes this case to *Hammond*. The ping here, however, only revealed travel inferentially: it showed that Defendant Baker's phone was located within 14 meters of 280 New Hancock Street, essentially indicating his presence inside the house, not on a public road. The government can deduce from this that Defendant traveled from 19 Bradford Street to 280 New Hancock Street, but it can only guess as to what route he took. As such, the government can hardly contend that the CSLI was limited to Defendant Baker's travel on public roads. Moreover, while the information captured in Hammond could have been viewed by citizens observing the public roadway, Defendant Baker's presence within a private residence could not.

Additionally, because the Court in Hammond noted that the government there had not examined "movements inside of a home," 996 F.3d at 389, the government argues here that Defendants' "movements inside their residence" were not "the subject of the CSLI." (Doc. 139, at 5). The court finds that the government has misconstrued Hammond's use of that phrase. The Seventh Circuit in Hammond contrasted the government's tracking of movements on public roads, which are open to public view, with

"movements inside of a home or other highly protected area." Hammond, 996 F.3d at 389. The word "movements" was used simply to maintain sentence symmetry in this comparison; it was not intended to connote a meaningful difference between governmental tracking of movements and tracking of mere location. For all practical purposes, GPS information does not provide relevant information concerning *activity* within a home, for it only reveals *location*. What the government really wants to know when it requests CSLI, after all, is *where* their suspect is, not what he is doing. Therefore, it is irrelevant that the government's CSLI in this case did not target "movements" inside the home.

Furthermore, the home has long been recognized as a paradigm of Fourth Amendment protection. *See* Kyllo, 533 U.S. at 40 (quoting Payton v. New York, 445 U.S. 573, 590 (2001)) ("We have said that the Fourth Amendment draws 'a firm line at the entrance to the house.'"); Lambis, 197 F.Supp.3d at 609 ("The home has special significance under the Fourth Amendment. "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting Kyllo, 533 U.S. at 31).

"At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free from governmental

intrusion." <u>U.S. v. Karo</u>, 468 U.S. 705, 714 (1984). This privacy includes privacy from detection inside the home by means unavailable to average citizens.[10] <em>See</em> <u>Karo</u>, 468 U.S. at 715; <u>Kyllo</u>, 533 U.S. at 40 ("Where, as here, the Government uses a device that is not in general public use, to explore details of the home that previously would have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant.").

Whereas the tracking in <u>Hammond</u> did not contravene society's expectation of privacy or law enforcement's capabilities, because it captured Hammond's location on a public road, the ping here located Defendant Baker in a private house. One's presence inside of a particular home is generally considered private, and society does not expect law enforcement to possess the capability of instantaneously locating citizens in a private space. <em>See</em>

---

[10]The Court in <u>Karo</u>, considering the government's use of a beeper installed in cans of ether that were brought inside the defendant's home, distinguished <u>Knotts</u> by noting that "[t]he information obtained in <em>Knotts</em>, 'was voluntarily conveyed to anyone who wanted to look…'" 460 U.S. at 281; while there, "the monitoring indicated that the beeper was inside the house, a fact that could not have been visually verified." 468 U.S. at 715. The Court went on to conclude that it could not "accept the Government's contention that it should be completely free from the constraints of the Fourth Amendment to determine by means of an electronic device, without a warrant and without probable cause or reasonable suspicion, whether a particular article—or a person, for that matter—is in an individual's home at a particular time." <em>Id.</em> at 716.

Commonwealth v. Almonor, 120 N.E.3d 1183, 1195 (Mass. 2019) ("[S]ociety's expectation has been that law enforcement could not secretly and instantly identify a person's real-time physical location at will."). Although perhaps not as invasive as the comprehensive data collected in Carpenter, the discovery of one's presence inside a private home does reveal "intricacies of private life." Personal associations, for instance, often take place within the walls of private dwellings, so even a snapshot of location information, reaching the target beyond the threshold of these walls, can provide an intrusive glimpse into his private affairs.

As the court in Lambis, 197 F.Supp.3d at 610, succinctly explained:

> Here, as in Kyllo, the DEA's use of the cell-site simulator to locate Lambis's apartment was an unreasonable search because the "pings" from Lambis's cell phone to the nearest cell site were not readily available "to anyone who wanted to look" without the use of a cell-site simulator. *See* United States v. Knotts, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); *see also* State v. Andrews, 227 Md.App. 350, 395–96, 134 A.3d 324 (2016) (holding that the use of a cell site simulator requires a search warrant based on probable cause, and finding that the trial court properly suppressed evidence obtained through the use of the cell-site simulator). The DEA's use of the cell-site simulator revealed "details of the home that would previously have been unknowable without physical intrusion," Kyllo, 533 U.S. at 40, 121 S.Ct. 2038, namely, that the target cell phone was located within Lambis's apartment. Moreover, the cell-site simulator is not a device "in general public use." Kyllo, 533 U.S. at 40, 121 S.Ct. 2038.

The government attempts to minimize the invasive nature of the real-time CSLI in this case by stating that "at best [it] placed [Defendants] within

a parameter in which the residence was located."[11] (Doc. 139, pg. 5). "Yet the Court has already rejected the proposition that 'inference insulates a search.'" Carpenter, 138 S.Ct. at 2218. The Court in Carpenter dismissed a similar argument, noting that the evidence there, combined with the inexact GPS information, sufficed to locate the defendant at the site of the alleged crimes. Here, too, the GPS location of Defendant Baker's cellphone, combined with the surrounding circumstances, sufficed to show the probable cause required for a search warrant. In addition, the Court in Carpenter emphasized the need for its ruling to "take account of more sophisticated systems that are already in use or in development." *Id.* at 2218 (quoting Kyllo, 533 U.S. at 36), and noted the rapidly increasing accuracy of CSLI. *Id.* Although CSLI today may not provide the same precision as the cell-site simulators discussed in Andrews and Lambis, it is approaching that level. Thus, any minor imprecision of the data collected here does not allow the government to circumvent usual privacy concerns.

For these reasons, the court concludes that the government's requested ping of Defendant Baker's cellphone in this case constitutes a Fourth Amendment search. *See* United States v. Ellis, 270 F. Supp. 3d 1134,

---

[11]According to the affidavit of probable cause, the ping showed that "the phone [Baker's cellphone] was located within 14 meters of 280 New Hancock Street." (Doc. 95-1, at 3).

1141-42, 1145–46 (N.D. Cal. 2017) (Holding "[u]nder the Katz [test], Ellis has demonstrated that the use of the Stingray devices amounted to a search in violation of a reasonable expectation of privacy in the real-time location of his cell phone." Also, holding "that cell phone users have an expectation of privacy in their cell phone location in real time and that society is prepared to recognize that expectation as reasonable"); *see also* United States v. Cooper, 2015 WL 88157, at *3–9 (N.D. Cal. Mar. 2, 2015) (finding that a showing of probable cause is required to obtain prospective, or real-time, cell-site data); In re Application for Tel. Info. Needed for a Criminal Investigation, 119 F. Supp. 3d 1011, 1022 (N.D. Cal. 2015) ("[L]ocation data generated by cell phones, which are ubiquitous in this day and age, can reveal a wealth of private information about an individual.").

Because the ping of Baker's cellphone was conducted without a warrant, it is presumptively unreasonable. This conclusion prompts the next inquiry: does an exception apply? Because Defendant Baker has satisfied his initial burden of showing that this search was conducted without a warrant, the burden shifts to the government to show that it was reasonable, i.e., that one of the exceptions applies. *See* U.S. v. Johnson, 63 F.3d 242, 246 (3d Cir. 1995).

## C. Whether an exception overcoming the presumption of unreasonableness applies

### a. Good-faith exception

The government first argues that, even if the ping constitutes a Fourth Amendment search, the good-faith exception to the presumption against warrantless searches applies. Baker argues that the good faith exception does not apply because the police did not rely on an objectively reasonable, good faith belief.

"When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Davis v. United States, 564 U.S. 229, 238 (2011). However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. at 238. Officers may have an objectively reasonable, good-faith belief that their conduct is lawful where they rely on a statute authorizing such conduct. See Davis, 564 U.S. at 239. Defendant Baker asserts that the government did not conduct the ping pursuant to the Stored Communication Act[12] or any state equivalent.

---

[12] 18 U.S.C. §§2701-2712

In response, the government points out that 18 U.S.C. §2702(c)(4) authorizes a cell phone provider to divulge subscriber information "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency."

"[I]n 2011, 18 U.S.C. §2702(c)(4) of the Stored Communications Act authorized cell phone service providers to disclose without a warrant 'a record or other information pertaining to a subscriber to or customer of [cell phone] service ... to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.'" U.S. v. Carballo, 963 F.Supp.2d 341, 360 (D. Vt. 2013). "Congress thus deemed it reasonable to subordinate any individual privacy interest in cell phone location information to society's more compelling interest in preventing an imminent threat of death or serious bodily injury." Id.

The Second Circuit, considering the applicability of this statute to a warrantless cellphone ping, explained that "[b]oth the [] statutory issue and the Fourth Amendment issue turn on whether the circumstances known to law enforcement and presented to Sprint were within the category of 'exigent

circumstances' that permit warrantless searches." U.S. v. Gilliam, 842 F.3d 801, 804 (2d Cir. 2016). The government here proceeds to argue accordingly, asserting that "[e]xigent circumstances to obtain the location of Baker's cellphone were clearly present." (Doc. 118). Because there is little indication that the government here actually relied on this statutory provision, i.e., §2702(c)(4), and because the provision turns on a determination of exigent circumstances, which is the government's next argument, the court proceeds to that discussion.

### b. Exigent circumstances exception

The government argues that exigent circumstances existed in this case because "Baker and Martinez had just committed a violent assault with the use of firearms"; "[t]he officer believed that the victim [Elliott] was shot by his assailants"; and "the two had fled the scene of the crime both armed and dangerous." (Doc. 118 at 14). The government also contends that the potential destruction of evidence represented an exigent circumstance, because Defendants left the scene with narcotics and firearms, and anticipated law enforcement pursuit. (Id. at 17-18). Defendant Baker, on the other hand, asserts that none of the material prepared in connection with the case indicates "that the suspects posed a danger to anyone or anything other than the fact that they were armed and committed a violent crime." (Doc. 95

at 19). Defendant Baker rejects the notion that exigent circumstances should be assumed in every case that involves violence and firearms. (Id.). Defendant also raises the fact that "the police did have time to obtain a warrant before entering 280 New Hancock" as weighing against a finding of exigent circumstances. (Doc. 120 at 6). Finally, Defendant notes that the ping "occurred well over an hour after the suspects were alleged to have left the scene of the assault." (Id.).

The Wilkes-Barre police here believed that Defendants had just violently assaulted and shot a victim. They were also informed by residents of 19 Bradford Street that Defendants had fled with firearms and narcotics, and that residents of the house feared Defendants. In such circumstances, law enforcement officers may reasonably believe that others are in imminent danger and that immediate action is necessary. That two apparent armed drug dealers, having just perpetrated a violent assault, would continue in a similar fashion elsewhere after fleeing the scene is a logical assumption. The gory scene at the house, the statements of residents indicating Defendants' violent tendencies[13], and the confusion of a quickly developing situation

_____

[13]Richard Kasperitis, a resident of 19 Bradford Street, told police that Feddy and Bug are in constant possession of handguns. (Doc. 95-1, at 2). Kasperitis also stated that Feddy and Bug spoke about how they had bodies on them from Philadelphia. (Id. at 5). Danylle Rambo stated that when she and Darryll Elliot entered the house, Feddy and Bug had handguns pointed

would reasonably inspire urgency on the part of responding officers. What is more, the nature of the disturbing assault on Elliott indicates a risk of further violence. With apparently little or no provocation, Defendant Martinez beat Elliott so severely with a hammer that medical personnel initially believed he had suffered a gunshot wound. (Doc. 95-1, at 3). After the beating, Feddy went upstairs, then returned downstairs to continue hitting Elliott. (Id.). This sustained, easily-triggered, and brutal assault, more so than a sudden violent response to an adversary's perceived threat, suggests that Defendants were likely to inflict serious harm on others after fleeing and that they posed an imminent threat to the community. Nor can it be ignored that it was reported to officers that Defendants possessed weapons and that they had already used them on Elliot.

Although more than an hour had passed between the police's arrival on the scene at the Bradford Street house and their request for an emergency ping on Baker's cellphone, (Doc. 95-1, at 9), the court finds that this temporal interval does not significantly diminish the urgency of the situation. The affidavit shows that the police did not sit idly in the meantime; rather, they were collecting the information which led to their request. It would

---

at them. (Id. at 3). Samantha Uhl, who had been staying at the house for a few months, stated that everyone in the house was afraid of Feddy and Bug, and that multiple times she feared retaliation for talking to police. (Id. at 6).

be unrealistic to demand that police take action the instant they arrive at the scene or else forgo this exception to the warrant requirement, for officers need at least some time to grasp the situation at hand and to chart a course of action, even in an emergency. Further, shortly before making the warrantless ping request, the police were informed (albeit erroneously) by medical personnel that the victim (Elliott) had been shot, (Id.), a discovery which would only have heightened their sense of risk. Under the totality of the circumstances of this case, the police could reasonably have concluded that the danger presented by the fleeing Defendants had not substantially abated in just one hour.

Regarding Defendant's contention that the police's ability to obtain a search warrant for 280 New Hancock Street undermines a claim of exigent circumstances, the court concurs with the government that this argument "misses the point." (Doc. 128 at 5). To the police, a home search would have been more obviously intrusive than a cell phone ping, a tactic which had not yet been squarely addressed by the courts, and the need for a warrant was more apparent. That the police applied for a warrant to search the house, several hours later and after having collected additional information, does not necessarily indicate that exigent circumstances at the time of the ping request were absent.

- 43 -

The court finds that the government has satisfied its burden of showing that its warrantless ping was justified. As such, the ping was reasonable, and the government's subsequent search of 280 New Hancock Street based on that ping did not violate the Fourth Amendment. Therefore, "there can be no reasonable dispute that the pinging of Defendant [Baker's] cell phone was occasioned by an 'exigent situation'", and the evidence obtained via that search will not be suppressed. <u>Carballo</u>, 963 F.Supp.2d at 963. Since "the court has specifically found that, in this case, law enforcement and Sprint Nextel acted reasonably and in good faith in relying upon the [Stored Communications Act's] provisions authorizing cell phone pinging in an exigent situation", "even if a Fourth Amendment violation could be found, suppression would not be warranted as it would serve no deterrent purpose." *Id*. at 965-66 (citations omitted). *See also* <u>United States v. Takai, 943 F.Supp.2d 1315, 1323 (D. Utah Apr. 30, 2013)</u> (holding that based upon the emergency provisions of the Stored Communication Act, "even if the court were required to find that [law enforcement] acquired the CSLI [cell site location information] in violation of Defendant's Fourth Amendment rights, the *Leon* good faith exception, as further applied by <u>Illinois v. Krull, 480 U.S. 340, 349, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987)</u>, would remove suppression as an available remedy").

### c. Inevitable discovery doctrine

The government also argues that even if the actions of police violated the Fourth Amendment, the evidence from the search should not be suppressed because it would inevitably have been discovered through independent means. (Doc. 118 at 19). Because the court concludes that the exigent circumstances exception to a search warrant applies here, it need not address the inevitable discovery doctrine.

### D. Evidentiary Hearing

The court will also deny Defendants' requests for an evidentiary hearing in this case regarding their motions to suppress the warrantless ping of Baker's cellphone.

"Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure permits defendants to file 'motions to suppress evidence' before trial, but evidentiary hearings on such motions are not granted as a matter of course." U.S. v. Hines, 628 F.3d 101, 105 (3d Cir. 2010) (citing Rule 12(c) ). "To require a hearing, a suppression motion must raise 'issues of fact material to the resolution of the defendant's constitutional claim.'" *Id*. (quoting U.S. v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996) ).

"A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to

conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." *Id*. (citations omitted). The court in Hines, 628 F.3d at 105, stated that "the purpose of an evidentiary hearing in the context of a suppression motion is to assist the court in ruling upon a defendant's specific allegations of unconstitutional conduct—its purpose is not to assist the moving party in making discoveries that, once learned, might justify the motion after the fact."

The court finds that an evidentiary hearing is not required in the present case regarding the pinging of Baker's cellphone since there has been an abundance of evidence already submitted and Defendants' suppression motions do not "set forth and identify for the court specific and concrete 'issues of fact material to the resolution of [their] constitutional claim[s].'" *Id*. (quoting Voigt, 89 F.3d at 1067).

As such, the court, in its discretion, finds that there is no need for an evidentiary hearing regarding Defendants' suppression motions.

### E. **Franks** Hearing

Both Defendants also seek to suppress all of the evidence obtained from the house in which they were found after police received a search warrant and argue that the search warrant for 280 New Hancock Street,

(Docs. 94-1 & 119-1), lacked probable cause. (Doc. 119, at 9). They point out that while the affidavit of probable cause for the search warrant stated that the ping indicated Baker's cellphone was within fourteen meters of 280 New Hancock Street, this contradicted multiple police reports which indicated the ping identified 278 New Hancock Street, a double unit, as the location of the phone. Defendants submitted photos of the New Hancock Street houses obtained from Google Maps. (Doc. 119-1). They also argue that the search warrant application was deficient in several other ways, including that it incorrectly indicated alleged participants, that it failed to indicate at least three other homes were within 14 meters of 280 New Hancock Street, and that it misrepresented when the police's surveillance of 280 New Hancock Street began. Further, Defendants argue that the generalized nature of the warrant and its failure to include them and the cellphone in the items to be searched and seized did not provide sufficient information in order for the state magistrate to determine whether there was probable cause to search 280 New Hancock Street. (Doc. 119, at 12).[14]

---

[14]The court notes that a separate search warrant was obtained to search the contents of Baker's cellphone after it was found during the execution of the search warrant for the house located at 280 New Hancock Street. (Doc. 121).

Additionally, Defendants identified several false statements and material omissions they allege were present in the affidavit, including a discrepancy over the actual address where the ping was located, improper reliance on an implication that a witness said an Uber driver involved with the defendants resided at 280 New Hancock Street, and the lack of connection between the defendants and 280 New Hancock Street. Thus, both Defendants contend that a <u>Franks</u> hearing is necessary in order to determine whether these deficiencies were material to the probable cause finding.

"In certain circumstances, a criminal defendant has the right to an evidentiary hearing to determine whether a search warrant was based on a false statement." <u>United States v. Braddy</u>, 722 Fed.Appx. 231, 235 (3d Cir. 2017) (citing <u>Franks v. Delaware, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)</u>). Contrary to the Defendants' assertions, based on the substantial facts already in the record, as thoroughly detailed above, the court finds that the alleged contradictory statements and omissions in the affidavit do not entitle them to a <u>Franks</u> hearing. In short, the affidavit of probable cause in support of the search warrant indicated that Kasperitis advised police that Darik Johnson, who was living at 280 New Hancock Street, was the Uber driver who picked up Defendants on December 17,

2017 from the 19 Bradford Street house after they brutally beat Elliott, and that after Baker's cellphone was pinged "the result showed that the phone was located within 14 meters of 280 New Hancock St[reet], within half [an] hour after the [suspected] shooting." Kasperitis also indicated to police that he "heard Feddy talking to a[n] Uber driver about a house on New Hancock St. before he left [19 Bradford St. house]" and, he identified Johnson as the Uber driver. The affidavit also indicates that after the pinging, "constant surveillance [was] conducted in the area [of 280 New Hancock St.]." (Doc. 119-1).

"In order to obtain a Franks hearing, a defendant must make 'a substantial preliminary showing' that (1) the warrant was based on a statement that was knowingly and intentionally false or made with reckless regard for the truth, and (2) the allegedly false statement was necessary to the finding of probable cause." *Id*. at 236 (citing Franks, 438 U.S. at 155-56, 98 S.Ct. 2674. "[T]he defendant cannot rest on mere conclusory allegations." *Id*. (quoting United States v. Yusuf, 461 F.3d 374, 383 n. 8 (3d Cir. 2006)).

Here, in light of the extensive record submitted by the parties, including copies of the stated affidavits, (*see* Docs. 94-1, 119-1 & 121), and the police reports as well as a copy of the state court transcript from the Defendants' March 16, 2018 preliminary hearing,  (Doc. 134), the court finds that the

Defendants failed to make the required preliminary showing for a <u>Franks</u> hearing. As the Third Circuit explained in <u>Braddy</u>, *id*. at 236, "[a]lthough some of the statements in the affidavits were inconsistent with statements found in other documents, the Defendants' bare allegations do not support a finding that any false statements were made knowingly and intentionally or with reckless disregard for the truth." Further, Defendants "have [not] shown that any of the allegedly false statements were necessary to the court's probable cause determination." Thus, Defendants are therefore not entitled to a <u>Franks</u> hearing. *See id*.

## IV. CONCLUSION

Based on the foregoing reasons, Defendants' motions to suppress, **(Docs. 94 and 96)**, the warrantless ping (Cell Site Location Information) of Baker's cellphone and the physical evidence obtained from the subsequent search, pursuant to a search warrant, of the house located at 280 New Hancock Street, are **DENIED**, without the need for an evidentiary hearing. Defendants' requests for a <u>Franks</u> hearing regarding the affidavit of probable

cause for the search warrant for the house located at 280 New Hancock Street, are **DENIED**. An appropriate order follows.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: September 23, 2021**
19-32-02